# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

ESTATE OF MARK RICHARDSON, *by its Special Administrator Justin Richardson,*

                    Plaintiff,

v.

CORRECTIONAL HEALTHCARE
COMPANIES, INC.,
NAUTILUS INSURANCE COMPANY,
JOY HAUBRICH, and
JANE SEITZ,

                    Defendants.

Case No. 15-CV-1200-JPS

ORDER

## 1.     INTRODUCTION

On June 3, 2016, the defendants filed a motion for summary judgment along with a supporting memorandum, statement of facts, and an affidavit of counsel with various attached exhibits thereto.[1] (Motion, Docket #26; Memorandum in Support, Docket #27; Statement of Fact, Docket #28; Declaration of Steven T. Elmer, Docket #34 with Exhibits 1-6). On June 30, 2016, the plaintiff Estate of Mark Richardson ("Richardson" or the "Estate")[2]

---

[1] The original motion document names Correctional Health Companies, Inc. ("CHC") and Nautilus Insurance Company as the moving parties. (Docket #26). Joy Haubrich ("Haubrich") and Jane Seitz ("Seitz") (collectively, the "Nurses") are not named in the motion. *Id.* The motion further names two non-parties, "Health Professionals Limited" and "Nurse Tina Kuehn." *Id.* On July 14, 2016, along with their reply briefing, the defendants submitted an "amended" motion which named the proper parties. The plaintiff requests denial of the amended motion. (Docket #50). The Court will permit the defendants to correct their typographical errors, as this will not affect the outcome their motion. The original motion will be denied as moot.

[2] Depending on the context, "Richardson" may refer to the plaintiff Estate or Mark Richardson himself. For clarity's sake, the Court will use male pronouns for "Richardson" regardless of the person or thing being referenced.

timely filed a response in opposition to the motion, along with a response to the defendants' statement of facts, an additional statement of facts, affidavits of expert witnesses, and an affidavit of counsel with various exhibits attached thereto. (Response, Docket #36; Response to Statement of Facts ("RSOF"), Docket #39; Additional Statement of Facts, Docket #40; Declaration of Travis Webb, Docket #37; Affidavit of Suzanne L. Ward, Docket #38; Declaration of Thomas C. Lenz, Docket #41 with Exhibits 1-39). On July 14, 2016, the defendants filed a reply in support of their motion, along with a response to Richardson's statement of facts, a reply in support of their own statement of facts, and additional affidavits of counsel with attached exhibits. (Reply, Docket #44; Response to Additional Statement of Facts ("RASOF"), Docket #46; Reply to Response to Statement of Facts ("RRSOF"), Docket #47; Declaration of Steven T. Elmer, Docket #45 with Exhibits 1-3; duplicate Declaration with additional exhibits, Docket #49 with Exhibits 1-3).[3] The motion is fully briefed and, for the reasons explained below, it will be denied in its entirety.

2.      STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 provides the mechanism for seeking summary judgment. Rule 56 states that the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016). A "genuine" dispute of material fact is created when "the evidence is such

---

[3]The Local Rules do not contemplate a reply in support of the moving party's own statement of facts, *see* Civil L. R. 56(b)(3)(B), but the Court will nevertheless permit it. The disagreements discussed therein demonstrate the parties' factual disputes *preventing* summary judgment in the defendants' favor. Richardson's motion to strike the same (Docket #51) will be denied.

that a reasonable jury could return a verdict for the nonmoving party."
*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court construes all facts and reasonable inferences in a light most favorable to the non-movant. *Bridge v. New Holland Logansport, Inc.*, 815 F.3d 356, 360 (7th Cir. 2016). In assessing the parties' proposed facts, the Court must not weigh the evidence or determine witness credibility; the Seventh Circuit instructs that "we leave those tasks to factfinders." *Berry v. Chicago Transit Authority*, 618 F.3d 688, 691 (7th Cir. 2010). It is important to note that internal inconsistencies in a witness' testimony "create an issue of credibility as to which part of the testimony should be given the greatest weight if credited at all." *Bank of Illinois v. Allied Signal Safety Restraint Systems*, 75 F.3d 1162, 1170 (7th Cir. 1996) (quoting *Tippens v. Celotex Corp.*, 805 F.2d 949, 953 (11th Cir. 1986)). The non-movant "need not match the movant witness for witness, nor persuade the court that [their] case is convincing, [they] need only come forward with appropriate evidence demonstrating that there is a pending dispute of material fact." *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 921 (7th Cir. 1994).

3.    RELEVANT FACTS

The Court will provide a timeline of events, as well as other relevant factual topics, noting the parties' disagreement where appropriate. In accordance with the standard of review, the facts and inferences therefrom are construed in Richardson's favor.[4]

---

[4]The parties' factual briefing is replete with unsupported facts, mis-supported facts (citing the wrong evidence), misquotes, multiple facts within one paragraph, and legal argument. This has made the task of wading through the hundreds of proffered facts unduly burdensome. The Court expects that these issues will not reoccur in any future motion practice.

Case 2:15-cv-01200-JPS   Filed 07/27/16   Page 3 of 27   Document 52

### 3.1 Richardson's Medical History

In May 2012, Richardson was incarcerated at the Racine County Jail (the "Jail"). RSOF ¶ 3.[5] Prior to his incarceration, Richardson was diagnosed with numerous medical issues. RRSOF ¶ 6. These included liver cirrhosis, diabetes, coronary artery disease, and multiple sclerosis. RRSOF ¶ 6. The parties disagree on the nature of Richardson's splenomegaly (spleen enlargement). The defendants claim that Richardson's spleen was chronically enlarged, while Richardson asserts that it was the result of acute trauma. RRSOF ¶ 6. Richardson took medication for some of these ailments; the parties dispute which ailments were medicated. RSOF ¶ 7.

Richardson reported various injuries prior to October 12, 2012. On September 28, 2012, Richardson reported to Seitz that he had been kicked in the side. RASOF ¶ 1. She took his blood pressure but did not document the interaction, despite recognizing that doing so was important. RASOF ¶ 1. On October 3, 2012, Richardson reported that he had fallen three times in the past few days. RASOF ¶ 2.

### 3.2 Night of October 12, 2012, and Morning of October 13, 2012

#### 3.2.1 Haubrich's 10:00 p.m. Visit

At approximately 10:00 p.m., Haubrich was working the evening shift when she was called to the cell block where Richardson was housed. RRSOF ¶ 11; RASOF ¶ 3.[6] She responded within five minutes. RASOF ¶ 4. Her

---

[5]Citations to the responsive fact documents are for brevity only; the cite may refer to material in the asserted fact, the response, and/or any reply.

[6]The defendants do not dispute the asserted call time in the RASOF, but appear to in the RRSOF. *See* RRSOF ¶ 11. The Court deems the call time uncontroverted, *see* Civil L. R. 56(b)(3)(B) and (4), and, in any event, the standard of review requires it to construe the fact in Richardson's favor.

testimony is conflicted as to whether she believed the situation was an emergency, or was merely told so by jail staff. RASOF ¶ 4. When she arrived there, Richardson was seated on a toilet in the cell block bathroom with a number of correctional officers present. RSOF ¶ 12. Haubrich waited for jail staff to get him off of the toilet before she entered. RSOF ¶ 12. Prior to entering, Officer Todd Kosterman ("Kosterman") told Haubrich that Richardson complained of dizziness, seeing spots, pain in his stomach and chest, and difficulty walking and breathing. RRSOF ¶ 13; RASOF ¶ 5.

Haubrich then entered the bathroom, and Richardson recounted the symptoms relayed by Kosterman. RASOF ¶ 6. Richardson also mentioned that he had liver problems. RASOF ¶ 11. Haubrich did not see Richardson's skin tone, but Kosterman observed that it was yellowish. RASOF ¶ 7. Richardson needed assistance to stand and had difficulty walking. RASOF ¶ 7. Haubrich contradicts herself as to whether she asked Richardson about pain, but she and Kosterman observed him apparently in pain and hunched over. RASOF ¶ 9-10. He was not sweating or out of breath and was otherwise polite with Haubrich. RSOF ¶ 14; RASOF ¶ 11. Officer Connie Taylor ("Taylor") was also present and observed Richardson's yellowish skin tone, which was different than it had been earlier, and that he looked weak and ill. RASOF ¶ 8. Taylor later noted in the activity log that Richardson "was feeling dizzy, seen [*sic*] spots and found it hard to breath" and that "his stomach hurt through his chest." RASOF ¶ 14.

Haubrich did not take Richardson's vital signs or otherwise perform a nursing assessment. RASOF ¶¶ 12, 19. Knowing that Richardson was diabetic, Haubrich suspected that he had either low blood sugar or mere indigestion. RSOF ¶ 15; RASOF ¶ 5. When his blood sugar test was normal, Haubrich determined that Richardson needed further assessment. RSOF

¶¶ 16-17; RASOF ¶ 12. She did not have with her the equipment to take his vital signs, so Haubrich directed the officers to place him in a medical observation cell. RSOF ¶ 18; RASOF ¶ 19, 21.[7] She did not give the officers instructions on what to watch for with Richardson's condition. RASOF ¶ 21. Richardson did not appear able to walk, so Haubrich requested a wheelchair. RASOF ¶ 22.

Haubrich did not document her interaction with Richardson, despite the fact that CHC policy required it and that she knew that she should have done so. RASOF ¶ 13. Haubrich did not give Richardson any medication or other treatment to relieve his pain and dizziness. RASOF ¶ 18. She did not call an on-call doctor regarding Richardson's condition, but the parties dispute whether this was required by CHC policy. RASOF ¶ 20. Though Haubrich never performed a nursing assessment on Richardson, she believed one was necessary. RASOF ¶ 25.

### 3.2.2   The Nurses' 11:00 p.m. Meeting

After directing the jail staff to take Richardson to observation, Haubrich left to finish passing medication to the other inmates. RRSOF ¶ 19; RASOF ¶ 23. She believed this would only take ten to fifteen minutes. RRSOF ¶ 19. Haubrich returned to the medical office at 11:00 p.m., where she met Seitz. RRSOF ¶¶ 19-20; RASOF ¶ 24.

The parties again disagree on Haubrich's assessment of Richardson's situation as an "emergency." Richardson points to Haubrich's testimony that she believed he needed further assessment before declaring it an emergency.

---

[7]Haubrich testified that it would have taken her five minutes to retrieve the necessary equipment and go to the observation cell. RASOF ¶ 19. She did not say how long it would have taken to get the equipment and return to the cell block bathroom. *Id.*

RASOF ¶ 26. The defendants cite to her testimony immediately prior where she agreed that Richardson was not having an emergency which required immediate hospitalization. RASOF ¶ 26. Nevertheless, Haubrich knew that Richardson could remain in pain until he was seen again by her or another provider. RASOF ¶ 27. She at least thought that Richardson's statements were truthful; Haubrich did not believe that Richardson was faking his symptoms. RASOF ¶ 28.

The defendants assert that the Nurses agreed to have Seitz assess Richardson, while Richardson points out their conflicting testimony. RRSOF ¶ 20; RASOF ¶ 30. Haubrich testified that Seitz volunteered to assess Richardson, and that Haubrich conveyed urgency about Richardson's health. RRSOF ¶ 20; RASOF ¶¶ 31, 35. Seitz, however, claims that Haubrich asked her to perform the assessment and failed to convey any urgency, instead stating that it could be done at some point in Seitz's shift. RRSOF ¶ 20; RASOF ¶¶ 32, 36. The parties agree that Haubrich related Richardson's symptoms to Seitz and that she must have told Seitz that no nursing assessment had been performed. RASOF ¶ 34. Haubrich definitely told Seitz that no vital signs had been taken. RASOF ¶ 35. The parties dispute Seitz's knowledge of Richardson's ongoing pain. RASOF ¶ 34. The parties further dispute when Haubrich actually left the Jail after her shift, and when Seitz went to the inmate housing area. RRSOF ¶ 11; RASOF ¶ 37.

### 3.2.3 Seitz's 1:30 a.m. Visit

Seitz usually received a report on an inmate's condition from correctional officers before going to see the inmate. RASOF ¶ 43. Sergeant Bradley Friend ("Friend"), the officer who went with Seitz to see Richardson, stated that another officer told him that Richardson was moved to the

observation cell due to shortness of breath and some other "malady." RASOF ¶ 44.[8] Friend did not tell Seitz about this, however. RASOF ¶ 44.

Seitz visited Richardson at approximately 1:30 a.m. RRSOF ¶ 21. Friend noticed that Richardson's skin was yellowish. RASOF ¶ 45. Seitz asked about Richardson's pain level, and a still frame taken from the cell surveillance footage appears to show her pointing to his chest, though the defendants claim the picture is too blurry to tell. RASOF ¶ 46. Richardson did not sit up when Seitz met with him. RASOF ¶ 47. The parties again dispute Seitz' knowledge of Richardson's pain. Richardson claims that she testified to that effect, while the defendants counter that her knowledge was indirect; her only recollection was that she gave him pain medication so he must have been in pain. RASOF ¶ 47.

Seitz's notes show that Richardson complained of moderate lower right-side rib pain. RRSOF ¶ 21; RASOF ¶ 48. Richardson further told Seitz that he had stomach pain, dizziness, and a history of liver cirrhosis. RRSOF ¶ 21; RASOF ¶ 48. While Seitz did not note stomach pain specifically, she did list his reported pain level as "5-6"out of ten. RASOF ¶ 48. Richardson was not wearing a shirt during their meeting, as shown on the surveillance footage, but Seitz cannot recall if his stomach was distended. RASOF ¶ 53.

Seitz took Richardson's vital signs and blood sugar; except for the blood pressure reading, the parties agree that they were within the normal range. RRSOF ¶¶ 22-23; RASOF ¶ 54. The defendants assert that the blood pressure reading was 128/78, which is within normal limits. RRSOF ¶¶ 22-23. Richardson counters that Seitz originally wrote 128/58, and the "5" in that

---

[8]The defendants attempt to assert a hearsay objection to RASOF paragraph 44 but failed to preserve it in the deposition. *See* Fed. R. Evid. 103(a).

entry was later overwritten with a "7." RRSOF ¶¶ 22-23; RASOF ¶ 55. Neither party has offered evidence of when the "7" was written or by whom. Seitz used her personal wrist blood pressure cuff to perform the test rather than a manual, upper arm cuff, which was available to her at the Jail. RRSOF ¶ 22; RASOF ¶¶ 57, 58. She did not know how often she calibrated her wrist cuff and knew it could give a reading inaccurate by as much as five points. RRSOF ¶ 22; RASOF ¶¶ 57, 59. Seitz did not press on Richardson's belly or listen to his bodily sounds with a stethoscope. RASOF ¶ 49. She did not take his temperature. RASOF ¶ 52.

Seitz gave Richardson Tums and Tylenol, noted that she would review the situation with a doctor "for further order," and left Richardson in the observation cell. RSOF ¶¶ 24-25; RASOF ¶ 60. Seitz's usual practice was to offer Tums to anyone with stomach-area pain. RASOF ¶ 61. Seitz, believing that Richardson's first set of vital signs were normal, decided to take a second set during her morning medication pass. RRSOF ¶ 26. The parties again dispute whether his blood pressure was in fact normal. RRSOF ¶ 26.

After the 1:30 a.m. visit, Seitz returned to the medical office and, if she had followed her normal practice, would have reviewed his medical chart which contained notes on his previous blood pressure readings, the September 28, 2012 trauma, and the October 3, 2012 falling incidents (she could not recall actually doing so). RASOF ¶ 66. Because she did not review the chart until after her visit, Seitz did not have notice that Haubrich had failed to document her interaction with Richardson. RASOF ¶ 39. The parties dispute whether Seitz would have called a doctor immediately had she known the full scope of Richardson's symptoms. RASOF ¶ 40. Richardson claims that she would have, while the defendants counter that she said so

hypothetically, and in any event did not have access to the correctional officer log which fully recounted Richardson's symptoms. RASOF ¶¶ 40, 68.

### 3.2.4   Richardson's Death and Aftermath

Surveillance footage showed Richardson tossing, turning, and sitting up and down until approximately 4:30 a.m., when he stopped moving entirely. RASOF ¶ 96. Seitz found Richardson dead at 5:50 a.m.; she and other jail staff found him unresponsive and were unsuccessful in their attempts to revive him. RSOF ¶ 27; RASOF ¶ 62. Wisconsin state law required jail staff to visually check on Richardson every hour, but they did not report anything unusual about his condition between the 1:30 a.m. assessment and 5:50 a.m. RSOF ¶ 28. Still, Seitz never contacted jail staff to see how Richardson was doing. RASOF ¶ 65.

On October 13, 2012, Jean Short ("Short"), the CHC contract manager, told James Olstinske ("Olstinske"), the Nurses' supervisor, that Richardson had fallen then died in his sleep. RASOF ¶ 71. On November 6, 2012, CHC administrative staff met with Olstinske and Short for a regular health services meeting. RASOF ¶ 94. During the meeting, Racine County Sheriff's Department Captain Doug Wearing discussed the policy and procedure for passing information to the jail staff regarding what to watch for in an inmate's condition when the inmate is sent for observation. RASOF ¶ 94.

### 3.3   Opinions on Richardson's Treatment and Cause of Death

Preliminarily, the Court notes that the defendants have objected to the affidavit testimony supplied by Richardson's medical experts, Dr. Travis Webb ("Dr. Webb") and Nurse Suzanne Ward ("Nurse Ward"). *See* (Docket #44 at 2-3); RRSOF ¶¶ 22-23, 26; RASOF ¶¶ 55-56, 99-100. The defendants claim that the affidavits fail to meet the expert report requirements of Federal Rule of Civil Procedure 26(a)(2)(B) because they were submitted months after

original reports were provided. (Docket #44 at 2-3). Generally, "[i]f a party fails to provide information…as required by Rule 26(a)…, the party is not allowed to use that information…to supply evidence on a motion…unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). This analysis requires a comparison of the experts' reports and new affidavits to determine whether the affidavit opinions are new. *See Rowe Intern. Corp. V. Ecast, Inc.*, 586 F.Supp.2d 924, 933-940 (N.D. Ill. 2008) (expert's declaration submitted in opposition to summary judgment largely excluded because it contains new opinions); *City of Gary v. Shafer*, No. 2:07-CV-56-PRC 2009 WL 1370997 *3-5 (N.D. Ind. May 13, 2009) (rebuttal expert report permissible because it is confined to rebutting opposing experts' reports and does not raise new arguments).

Upon review of the reports and affidavits, the Court finds that both affidavits present new or different opinions which were not contained in the experts' reports. Dr. Webb's report expresses uncertainty as to the exact time Richardson's spleen ruptured, while his affidavit is much more precise, opining that the rupture likely had occurred by the time of Haubrich's visit. (Docket #34-6 at 3-4; Docket #37 at 1). Nurse Ward's report mentions nothing about the abnormality of Richardson's blood pressure readings, but that is the focus of her affidavit. (Docket #41-13; Docket #38 at 2). Thus, under Rule 37(c)(1), the affidavits cannot be considered by the Court. In any event, Richardson survives summary judgment without them.

### 3.3.1 The Nurses' Treatment

The general opinion on Haubrich's treatment efforts is that they were poor. The two officers that were present for Haubrich's 10:00 p.m. visit with Richardson, Kosterman and Taylor, felt the situation was an emergency and were surprised that Haubrich did not take Richardson's vital signs, as is

typical in such situations. RASOF ¶¶ 15, 17. As noted above, it is not clear whether Haubrich herself viewed the situation as an emergency. James Olstinske ("Olstinske"), Haubrich's supervisor, testified that, given the symptoms Richardson reported to her in the cell block bathroom, he would have expected Haubrich to immediately perform a nursing assessment. RASOF ¶ 16. He further opined that the normal blood sugar test made it obvious that something other than blood sugar was wrong with Richardson. RASOF ¶ 16.

The opinions of Seitz's treatment are similarly critical. At her deposition, Haubrich found it troubling that Seitz waited until 1:30 a.m. to see Richardson, as Haubrich felt he needed to be assessed as soon as possible. RASOF ¶ 42. The longest period she would have been comfortable waiting to assess him was fifteen or twenty minutes. RASOF ¶ 42. Olstinske also opined that, given the symptoms taken from Haubrich's first meeting, he would expect Seitz to pass that information to a doctor or registered nurse as soon as possible. RASOF ¶ 69. Seitz admitted that if another medical professional with a more advanced license had been on-duty with Seitz, that person would have seen Richardson instead of her. RASOF ¶ 93. She further admitted that she was not qualified to rule out the situation as an emergency. RASOF ¶ 67. At her deposition, Seitz stated that she wished she had called the doctor after the 1:30 a.m. visit. RASOF ¶ 70.

The parties dispute whether it was appropriate for Seitz to touch Richardson in examining him. Seitz stated multiple times that she believed she was not allowed to touch inmate patients. RASOF ¶ 50. However, she also claimed that she could have listened to his bowel sounds with a stethoscope. RASOF ¶ 50. CHC policy on abdominal pain required abdominal touching and listening using a stethoscope. RASOF ¶ 50.

Olstinske testified there were no prohibitions to such contact and that doing so was important. RASOF ¶ 50. Friend had previously observed nurses touching inmates' abdomens and using stethoscopes. RASOF ¶ 51

Finally, with regard to the time after the 1:30 a.m. visit, Seitz believed it was important to check up on Richardson after giving him medication, but did not do so until 5:50 a.m. RASOF ¶ 62. Seitz asserted that the delay in checking up on Richardson was acceptable, citing the "patient ratio" she had to deal with in the Jail. RASOF ¶¶ 62, 64.[9] She implied that in a non-correctional setting, it would have been appropriate to see to Richardson sooner. RASOF ¶ 64.

### 3.3.2   Cause of Death

Richardson's autopsy report lists his causes of death as "complications of chronic alcohol abuse, splenomegaly, [and] liver cirrhosis." RRSOF ¶ 31. Richardson claims that the primary cause of death was splenic rupture. RRSOF ¶ 31. The death certificate listed the same causes of death as the autopsy report. RSOF ¶ 32.

Dr. Webb opines that it is not clear what precisely caused Richardson's splenic rupture or when it occurred. RRSOF ¶ 33. He states that it may have been "spontaneous or secondary to previously identified trauma." RRSOF ¶ 33. The records he reviewed "indicate[d] a high likelihood of antecedent trauma which is consistent with a delayed bleed (rupture) of the spleen." RRSOF ¶ 33. A delayed bleed could have begun as early as two weeks prior to Richardson's death, while an acute rupture would have likely been within the previous twelve to twenty-four hours. RRSOF ¶ 33.

---

[9]Olstinske felt that the Jail was commonly short-staffed. RASOF ¶ 95.

Dr. Agienszka Rogalska, a medical examiner who was involved in Richardson's autopsy, stated the following:

> There is no definitive point that I can say he ruptured his spleen. But it was at least after he was seen by the nurse (normal vitals) and before he died. A spleen can bleed out in a matter of minutes.

RSOF ¶ 34.

### 3.4 Relevant Corporate Policies and Training

#### 3.4.1 CHC's Policies

CHC maintains a lengthy, comprehensive manual on its policies, procedures, and protocols (the "Manual"). (Docket #41-11, Deposition of James Olstinske, 25:18-26:4). The nursing staff were not given an individual copy of the Manual; one copy was kept in the medical office for use as a reference. RASOF ¶ 73. They were not instructed to use the Manual in any particular way. RASOF ¶ 73. The policies contained therein were at least guidelines, and may have been mandatory, for all employees to have access to and follow. RASOF ¶ 74.[10] Similarly, nurses were expected to follow CHC's clinical protocols. RASOF ¶ 74.[11] It is unclear whether the Manual at the Jail was site-specific or a generic manual for use throughout CHC's operations. RASOF ¶ 75.

CHC requires annual training on its policies, procedures, and protocols for its healthcare staff. RASOF ¶ 76. This training was to be documented in each employee's personnel file. RASOF ¶ 76. Nurse

---

[10]Short testified multiple times on whether the manuals needed to be followed, sometimes calling them guidelines, and in one instance called them mandatory. RASOF ¶ 74. This internal conflict is a credibility issue which the Court cannot resolve here.

[11]The dispute, and its resolution, are the same as in footnote ten.

orientation was also required to be documented. RASOF ¶ 76. Though Olstinske was generally responsible for nursing staff training, he never had any such training documentation and consequently never put it in any employee personnel files. RASOF ¶¶ 76-77. When hired by CHC, Olstinske received approximately two weeks of training, though he was never actually trained on how to train the nursing staff. RASOF ¶ 77. CHC did not have a minimum required amount of training for nurses. RASOF ¶ 77. It is not clear whether nurses received training on following up with inmates who were given pain medication. Richardson's counsel asked Olstinske about this but his answer was directed at actual practice, not training. RASOF ¶ 78.

CHC also requires that all nurses be trained generally on how to respond to jail emergencies. RASOF ¶ 72. CHC's emergency services policy requires that in an emergency situation, nurses are to call emergency medical services for life-threatening conditions and the on-call doctor if the inmate's condition is not life-threatening. RASOF ¶ 98.

### 3.4.2 The Nurses' Training

During the relevant time period, both Nurses were licensed. RRSOF ¶¶ 8-9. Haubrich was a registered nurse ("RN"), while Seitz was a licensed practical nurse ("LPN"). RRSOF ¶¶ 8-9. To obtain their licenses, each was required to complete clinical training, although there is no testimony on what that training actually entailed. RRSOF ¶¶ 8-9. The Nurses were employed by CHC to provide on-site healthcare to all of the approximately six-hundred Jail inmates. RSOF ¶ 10.

Haubrich began working at the Jail in August 2011 on an as-needed basis. RASOF ¶ 79. She did not care for the environment or work she was given at the Jail; she stated that her primary role was dispensing medications. RASOF ¶ 79. Olstinske's general review of Haubrich's work at the Jail was

that she failed to take initiative, had to be constantly directed to fulfill her duties, and sometimes did the bare minimum to get by. RASOF ¶ 29.

Even "as-needed" nurses were required to be trained like any other nurse. RASOF ¶ 79. Haubrich's testimony is conflicted regarding her training. She variously testified that she received no training on documenting patient interactions and did not know about CHC's patient interaction form, and also that she was "probably" told to document patient interactions. RASOF ¶ 80. She did not even know that CHC kept the Manual available in the Jail. RASOF ¶ 83. Haubrich felt she was not adequately trained generally, and specifically on how to deal with healthcare emergencies. RASOF ¶ 81. She was never given training on correctional medicine. RASOF ¶ 84. Haubrich was not given an "in-depth orientation" as defined by CHC's manual, which would have included facility-specific training and training on the differences between private and correctional healthcare. RASOF ¶ 85. She was told that, during daytime shifts, other people would handle emergencies, though Olstinske never gave her that instruction. RASOF ¶ 81. Short believes that Haubrich would know how to assess a patient based on her professional training. RASOF ¶ 82.

Seitz received some, but not all, of CHC's "basic orientation," which included training on security and health services policies, responses to emergencies, a "functional position description," and patient-staff relationships. RASOF ¶ 86. She also received at least a portion of the "in-depth orientation" described above. RASOF ¶ 85. Seitz was generally unfamiliar with the Manual and had never consulted it. RASOF ¶ 87. She never received any formal training on calling an on-call doctor. RASOF ¶ 88. Seitz stated that no one explained to her how to deal with emergencies, and that unless an emergency happened to occur during the course of a nurse's

training, no one would ever have been specifically trained for them. RASOF ¶ 89. Seitz believed her license permitted her to conduct a nursing assessment. RASOF ¶ 90. Her LPN coursework did not involve correctional medicine. RASOF ¶ 91. Finally, with regard to Richardson's treatment, she was trained by a third-shift on-call doctor to take two sets of vital signs, and that she should only call him after the second set, if the first set of signs was not abnormal. RASOF ¶ 92.

### 3.4.3 Other Policy Violations

Apart from those discussed above, Richardson asserts that various other CHC policies were violated throughout the events leading to Richardson's death. First, CHC's medical housing protocol required that inmates receive an assessment during the shift on which they were admitted. RASOF ¶ 38. The defendants claim that this protocol does not apply to the Jail because it lacked an infirmary. RASOF ¶ 38. Haubrich left the Jail without performing an assessment, and she knew that Seitz was not licensed to do so. RASOF ¶ 38. The defendants contend that Seitz was authorized to perform a nursing assessment. RASOF ¶ 38.

Second, CHC policy states that inmates shall receive timely care for their serious medical needs. RASOF ¶ 41. Richardson believes that Seitz violated this policy by not meeting with Richardson until 1:30 a.m., despite knowing that he was experiencing pain and dizziness. RASOF ¶ 41. The defendants counter that the policy does not define "timely." RASOF ¶ 41.

### 4.  ANALYSIS

The defendants seek summary judgment on each of Richardson's claims. (Docket #27 at 17). The Amended Complaint asserts two constitutional claims, one for Richardson's pain and suffering leading to his death and the other for his death itself, as well as a state law wrongful death

claim. (Docket #3 at 8-10). Richardson asserts the constitutional claims against CHC under the *Monell* theory of liability discussed below. *Id.*

The defendants assert that all of the claims are defeated by a lack of causation. (Docket #27 at 12-15). They further argue that the constitutional claims fail because Haubrich and Seitz were not deliberately indifferent to Richardson's serious medical needs. *Id.* at 4-12. Finally, CHC contends that *Monell* liability is inappropriate in this case. *Id.* at 15-16.

The parties' disputes of fact, as well as Richardson's proffered facts, preclude summary judgment on Richardson's deliberate indifference claims. Further, Richardson's evidence carries his burden to avoid summary judgment on the *Monell* claims and causation.

### 4.1    Deliberate Indifference

To state a claim for a violation of constitutional rights pursuant to 42 U.S.C. § 1983, a plaintiff must prove that: 1) he was deprived of a right secured by the Constitution or laws of the United States; and 2) the deprivation was visited upon him by a person or persons acting under color of state law. *Buchanan-Moore v. County of Milwaukee*, 570 F.3d 824, 827 (7th Cir. 2009) (citing *Kramer v. Village of North Fond du Lac*, 384 F.3d 856, 861 (7th Cir. 2004)); *see also Gomez v. Toledo*, 446 U.S. 635, 640 (1980). The defendants do not dispute that they acted on the color of state law.

They do, however, argue that they did not violate Richardson's constitutional rights. As noted above, Richardson asserts two related constitutional claims under the Eighth Amendment for inadequate medical care. In the recent *Gayton* case, the Seventh Circuit outlined the applicable law:

[T]he plaintiff must show that: (1) [he] had an objectively serious medical condition; (2) the defendants knew of the condition and were deliberately indifferent to treating [him]; and (3) this indifference caused [him] some injury. An objectively serious medical condition is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would perceive the need for a doctor's attention. A medical condition need not be life-threatening to be serious; rather, it could be a condition that would result in further significant injury or unnecessary and wanton infliction of pain if not treated.

With regard to the deliberate indifference prong, the plaintiff must show that the official acted with the requisite culpable state of mind. This inquiry has two components. The official must have subjective knowledge of the risk to the inmate's health, and the official also must disregard that risk. Evidence that the official acted negligently is insufficient to prove deliberate indifference. Rather, "deliberate indifference" is simply a synonym for intentional or reckless conduct, and that "reckless" describes conduct so dangerous that the deliberate nature of the defendant's actions can be inferred. Simply put, an official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. Even if a defendant recognizes the substantial risk, he is free from liability if he responded reasonably to the risk, even if the harm ultimately was not averted. Whether a medical condition is "serious" and whether a defendant was "deliberately indifferent" to it are fact questions, to be resolved by a jury if a plaintiff provides enough evidence to survive summary judgment.

*Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010) (citations and quotations omitted). Though the defendants provide some citations with regard to the "serious medical condition" element, they failed to make any argument that the element is not met in this case. *See* (Docket #27 at 5-6, 9-12; #44 at 3-9). The

Court will, therefore, focus its attention on the "deliberate indifference" element.

Richardson has marshaled more than enough evidence to survive summary judgment on deliberate indifference. As the lengthy factual discussion above shows, numerous facts are disputed. These include but are not limited to the following: 1) whether Richardson's splenomegaly was chronic or acute; 2) whether either of the Nurses considered Richardson's situation to be an emergency, which would have necessitated calling a doctor; 3) when and to what extent either of the Nurses were aware of Richardson's various symptoms and pain level; 4) the agreement, or lack thereof, during the Nurses' 11:00 p.m. shift-change meeting, resulting in a more than two-hour gap in treatment; 5) conflicting opinions on the appropriateness of each Nurses' treatment; and 6) the Nurses' internally-conflicting testimony. *See supra* Parts 3.1, 3.2, and 3.3.1. These disputes are material to a finding of "deliberate indifference" by the Court or a jury. Namely, they bear on the Nurses' awareness of facts underlying the risk of pain, injury, and ultimately death to Richardson, whether they actually drew the inference of those risks, and the reasonableness of their responses to those risks.

Beyond these factual disputes, Richardson has offered enough undisputed (or not genuinely disputed) evidence which, when viewed in a light most favorable to him, allows him to pass the low threshold required to stave off summary judgment. He has adduced evidence from which a jury could infer the following sequence of events. *See supra* Part 3.

Richardson's spleen was damaged or ruptured on or about September 28, 2012 by blunt trauma (a kick). When Haubrich met with Richardson at 10:00 p.m., she failed to identify all of his symptoms that even

non-medical correctional officers could detect. Those symptoms indicated that his condition was far more serious than low blood sugar or indigestion. She then left Richardson's side without performing common, necessary tests or giving him any treatment.

Regardless of which nurse bears the blame, Richardson was left without treatment for the next two-and-a-half hours. The Nurses' meeting, at very least, conveyed to Seitz that Richardson had not been given a nursing assessment. Like Haubrich, Seitz failed to perform necessary tests or appreciate the seriousness of Richardson's illness at her 1:30 a.m. visit. She merely gave him Tums and Tylenol and left, intending to return at the morning medication pass.

Seitz never checked in on Richardson or asked the officers how he was doing. The next time she saw Richardson was when he was found dead at 5:50 a.m. Both of the Nurses should have, but did not, properly document their interactions with Richardson or consult his medical chart to review his interaction history (namely, the kick) or what previous treatment he had received. Nurse Ward and the Nurses' own supervisor, Olstinske, agree that the situation required more than what was done, including calling a doctor.

This fact pattern is precisely the reason that a deliberate indifference claim may be proven with evidence of something other than intentional conduct. Deliberate indifference may also be established by showing recklessness "so dangerous that the deliberate nature of the defendant's actions can be inferred." *Gayton*, 593 F.3d at 620. The defendants argue that because the Nurses were not literally indifferent—they saw Richardson, moved him to an observation cell, gave him over-the-counter medication, etc.—they cannot be "deliberately indifferent." (Docket #27 at 9-12). The mere provision of some medical treatment does not eliminate potential

Case 2:15-cv-01200-JPS   Filed 07/27/16   Page 21 of 27   Document 52

constitutional liability. *Edwards v. Snyder*, 478 F.3d 827, 831 (7th Cir. 2007). Their conduct would allow a jury to "infer the treatment was so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate a medical condition." *Id.* at 831 (quotation omitted). A reasonable jury could, therefore, conclude that the Nurses exhibited the requisite degree of recklessness, establishing the deliberate indifference element. Again, the above fact pattern may not coincide with what a jury ultimately determines, but such speculation is not permitted by the standard of review.

### 4.2    *Monell* Liability

Local government entities, such as municipalities and counties, cannot be held vicariously liable for the constitutional violations committed by their employees. *Monell v. Dept. of Social Services of City of New York*, 436 U.S. 658, 690 (1978). Such entities can, nevertheless, be liable under Section 1983 if "the unconstitutional act complained of is caused by: (1) an official policy adopted and promulgated by its officers; (2) a governmental practice or custom that, although not officially authorized, is widespread and well settled; or (3) an official with final policy-making authority." *Thomas v. Cook County Sheriff's Dept.*, 604 F.3d 293, 303 (7th Cir. 2009) (citing *Monell*, 436 U.S. at 690). CHC can be liable under this theory as an entity which contracted with the Jail to provide medical services. *Minix v. Canarecci*, 597 F.3d 824, 834 (7th Cir. 2010).

CHC will bear liability for its policies if Richardson can show that it was deliberately indifferent to the known or obvious consequences of those policies, namely that they would cause unconstitutional harm. *Thomas*, 604 F.3d at 303. The policies must also be the "moving force" behind the constitutional violation. *Estate of Sims v. County of Bureau*, 506 F.3d 509, 514 (7th Cir. 2007). Liability can arise from both implementing an unconstitutional policy and failing to establish a policy "in situations where

rules or regulations are required to remedy a potentially dangerous practice[.]" *Thomas*, 604 F.3d at 303.

Richardson seeks to hold CHC liable for failing to properly train Haubrich and Seitz. The parties have not identified, and the Court's independent research has not located, applicable Seventh Circuit precedent on the matter. The defendants claim that they were not required to provide any training to the Nurses because they had completed the professional training necessary to obtain their licenses. (Docket #27 at 16). The Ninth Circuit reasoned, and this Court agrees, that hiring licensed professionals does not foreclose a failure-to-train claim. *Long v. County of Los Angeles*, 442 F.3d 1178, 1187-88 (9th Cir. 2006). When the plaintiff adduces evidence of inadequate training, licensure becomes merely a countervailing fact to be presented at trial. *Id.*

Richardson may also question the adequacy of the training CHC provided. *Id.* at 1188-89; *Shadrick v. Hopkins County, Ky.*, 805 F.3d 724, 740-43 (6th Cir. 2015). The evidence favorable to Richardson shows that CHC might as well have had no Manual at all, as neither Nurse was given a copy, instructed how use it, or in fact used it. They also received minimal training which, in any event, CHC failed to document. Haubrich herself believed her training was generally inadequate, while both Nurses acknowledged that they were not trained on how to deal with emergencies. Both Nurses violated multiple CHC policies on inmate medical care, apparently unknowingly. Like the Sixth Circuit, this Court finds that when "[t]aking th[e] evidence in a light most favorable to [Richardson], …a reasonable jury could find that [CHC] was deliberately indifferent to the need to train and supervise [the Nurses] to provide adequate medical care to inmates." *Shadrick*, 805 F.3d at 741.

The defendants further claim that Richardson cannot show that CHC understaffed the Jail. However, Olstinske testified to this very fact. Anticipating this, the defendants next argue that understaffing cannot support the *Monell* claims because Richardson has offered no evidence that "something different would have happened had more staff been on duty." (Docket #44 at 10). The defendants are incorrect. Seitz admitted that another more qualified medical professional would have seen Richardson had one been available on her shift. Dr. Webb, a more qualified professional, opined that his treatment would have involved lab tests, an EKG, and a CT scan of Richardson's abdomen. *See* (Docket #34-6 at 2). Thus, the Court finds that Richardson has raised a triable fact issue on the role of understaffing in the *Monell* claims.

Finally, the defendants question the causation element of the *Monell* claims, namely, whether the Nurses' lack of training was the "moving force" behind Richardson's death. (Docket #27 at 16). As described above, CHC provided little training to the Nurses and did not require adherence to or even knowledge of the Manual. The policies and procedures contained in the Manual, had they been followed, would have resulted in a vastly different course of treatment for Richardson. A reasonable jury could find that CHC's unofficial policy of minimal training and ignoring its own policy manual was the moving force behind Richardson's death.

4.3    Causation

All torts, constitutional or otherwise, require evidence of causation to be successfully proven. *University of Texas Southwestern Medical Center v. Nassar*, 133 S.Ct. 2517, 2524-25 (2013); *Berman v. Young*, 291 F.3d 976, 982 (7th Cir. 2002). As with all the elements of a civil case, causation must be proven by a preponderance of the evidence. SEVENTH CIRCUIT PATTERN JURY

INSTRUCTION 1.27, "Burden of Proof." Causation is generally a jury question. *Gayton*, 593 F.3d at 624. In the context of a "pain and suffering" constitutional claim, the Seventh Circuit held that "only in the rare instance that a plaintiff can proffer no evidence that a delay in medical treatment exacerbated an injury should summary judgment be granted on the issue of causation." *Id.* The defendants argue that Richardson died of a ruptured spleen and that there is no evidence that this injury occurred prior to his assessment by Seitz. (Docket #27 at 13-15). Richardson counters that the medical experts disagree on the timing issue. (Docket #36 at 28-29). Further, his expert need not be absolutely certain on timing to create a jury issue. *Id.*; *Bass by Lewis v. Wallenstein*, 769 F.2d 1173, 1184 (7th Cir. 1985). Finally, Richardson contends that the defendants entirely failed to address causation with regard to his pain and suffering claims. *Id.* at 29. The defendants reply that, as noted above, the affidavits of Richardson's medical experts must not be considered. (Docket #44 at 2-3). Without them, the defendants believe that no medical opinion places Richardson's splenic rupture before he was seen by either nurse, thus defeating causation. *Id.* at 3.

Richardson has created a jury question on causation for all of his claims. First, as noted by Richardson in his response, the defendants failed to make any argument with respect to causation on his pain and suffering claims.[12] Both the defendants' opening brief and their reply focus on the time of splenic rupture as related to Richardson's death. Further, the Estate

---

[12] It is curious that the defendants would do so. The law contemplates claims for pain and suffering under the auspices of both deliberate indifference and wrongful death. *Gayton*, 593 F.3d at 619; *Bartholomew v. Wisconsin Patients Compensation Fund and Compcare Health Services Ins. Corp.*, 717 N.W.2d 216, 253 (Wis. 2006) (citing *Schwab v. Nelson*, 25 N.W.2d 445, 447 (Wis. 1946)).

has offered ample evidence that, regardless of when Richardson's spleen ruptured, he suffered serious pain while under the Nurses' care, and their failure to appropriately treat him exacerbated the pain. *See supra* Part 3.2.

Second, though the defendants contend that there is "no medical evidence beyond possibility or speculation" regarding the timing of Richardson's splenic rupture, they are incorrect. (Docket #44 at 3). The two medical opinions that weigh on timing, those of Dr. Rogalska and Dr. Webb, disagree. Dr. Rogalska's is admittedly more definite, setting the time of rupture at a point after Seitz' 1:30 a.m. visit. However, Dr. Webb does not "state[] that it is impossible to tell whether Richardson's spleen ruptured before or after he was assessed by Nurse Seitz." (Docket #27 at 15). Rather, he opines that the matter is unclear and offers two alternative time frames for rupture, both of which would have occurred before Haubrich's 10:00 p.m. visit. This is made clearer by operation of the standard of review. Viewing the facts most favorably to Richardson, the spleen ruptured as a result of the abdominal trauma (the kick) which occurred on September 28, 2012. This "delayed bleed" began no more than two weeks before Richardson's death, within the realm of possibility as defined by Dr. Webb. While Dr. Webb's opinion is not precise, it is enough to create a factual issue on causation, and the defendants will be free to argue the opinion's faults to the jury.

5.    CONCLUSION

Richardson has adequately disputed a number of critical facts material to his deliberate indifference claims, in addition to raising many favorable undisputed facts. Further, he has adduced sufficient undisputed evidence that, when viewed in his favor, would allow a jury to find for him on his *Monell* claims and on causation. The defendants' motion for summary judgment must, therefore, be denied in its entirety.

Accordingly,

IT IS ORDERED that the defendants' motion for summary judgment (Docket #26) be and the same is hereby DENIED as moot;

IT IS FURTHER ORDERED that the plaintiff's motion to seal (Docket #35) be and the same is hereby GRANTED;

IT IS FURTHER ORDERED that the plaintiff's motion to strike (Docket #51) be and the same is hereby DENIED; and

IT IS FURTHER ORDERED that the defendants' amended motion for summary judgment (Docket #42) be and the same is hereby DENIED.

Dated at Milwaukee, Wisconsin, this 27th day of July, 2016.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge